UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOHN DOE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:12-cv-0062  TWP-MJD |
| | ) | |
| PROSECUTOR, MARION COUNTY, | ) | |
| INDIANA, | ) | |
| | ) | |
| Defendant. | ) | |

**Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction**

<u>Introduction</u>

The use of computer-based social networking web sites, instant messaging, and chat rooms has become ubiquitous in today's society.  Sites such as Facebook are used by millions of persons daily to communicate and express themselves. The sites are also used for political and other associational activities and expression.  However, Indiana Code § 35-42-4-12(e) makes it a crime for certain persons required to register on Indiana's sex and violent offender registry to knowingly or intentionally use these avenues of communication if persons under the age of 18 also have access to, or can use, them.  Because many former offenders are required to register for their lifetimes, the statute erects a permanent ban on vast and burgeoning methods of communication and association.  To the extent that this ban is applied to former offenders who are not on parole, probation, or other forms of supervised release, it denies them the ability to communicate and associate in violation of the First Amendment of the United States Constitution.  The statute is overbroad and unconstitutional.  Inasmuch as all the requirements for the grant of a preliminary injunction are met here, one should issue, without bond.

**Preliminary injunction standard**

The standard in the Seventh Circuit for the granting of a preliminary injunction is clear. In order to determine whether a preliminary injunction should be granted, the Court weighs several factors:

> (1) whether the plaintiff has established a prima facie case, thus demonstrating at least a reasonable likelihood of success at trial;
>
> (2) whether the plaintiff's remedies at law are inadequate, thus causing irreparable harm pending the resolution of the substantive action if the injunction does not issue;
>
> (3) whether the threatened injury to the plaintiff outweighs the threatened harm the grant of the injunction may inflict on the defendant; and
>
> (4) whether, by the grant of the preliminary injunction, the public interest would be disserved.

*See, e.g.*, *Baja Contractor, Inc. v. City of Chicago*, 830 F.2d 667, 675 (7th Cir. 1987).  The heart of this test, however, is "a comparison of the likelihood, and the gravity of two types of error: erroneously granting a preliminary injunction, and erroneously denying it."  *See Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 590 (7th Cir. 1984).  After weighing these factors, it is clear that a preliminary injunction should issue in this case.

**Factual allegations and the challenged statute**

It is believed that the following facts will be presented in support of the preliminary injunction request.

*The applicable statute and sex offender registration*

Indiana law requires that certain persons convicted of specific offenses register as sex or violent offenders.  IND. CODE §§ 11-8-8-4.5, 11-8-8-5, 11-8-8-7.  Depending on the offense or the classification of the former offender, the registration period may be for 10 years after the later of the person's release for prison, placement in a community corrections or transition

program, or placement on probation or parole, or for the person's lifetime.  IND. CODE § 11-8-8-

18.

Indiana Code § 35-42-4-12 provides:

(a) This section does not apply to a person to whom all of the following apply:

(1) The person is not more than:

(A) four (4) years older than the victim if the offense was committed after June 30, 2007; or

(B) five (5) years older than the victim if the offense was committed before July 1, 2007.

(2) The relationship between the person and the victim was a dating relationship or an ongoing personal relationship. The term "ongoing personal relationship" does not include a family relationship.

(3) The crime:

(A) was not committed by a person who is at least twenty-one (21) years of age;

(B) was not committed by using or threatening the use of deadly force;

(C) was not committed while armed with a deadly weapon;

(D) did not result in serious bodily injury;

(E) was not facilitated by furnishing the victim, without the victim's knowledge, with a drug (as defined in IC 16-42-19-2(1)) or a controlled substance (as defined in IC 35-48-1-9) or knowing that the victim was furnished with the drug or controlled substance without the victim's knowledge; and

(F) was not committed by a person having a position of authority or substantial influence over the victim.

(b) This section applies only to a person required to register as a sex or violent offender under IC 11-8-8 who has been:

(1) found to be a sexually violent predator under IC 35-38-1-7.5[1]; or

(2) convicted of one (1) or more of the following offenses:

    (A) Child molesting (IC 35-42-4-3).

    (B) Child exploitation (IC 35-42-4-4(b)).

    (C) Possession of child pornography (IC 35-42-4-4(c)).

    (D) Vicarious sexual gratification (IC 35-42-4-5(a) or IC 35-42-4-5(b)).

    (E) Sexual conduct in the presence of a minor (IC 35-42-4-5(c)).

    (F) Child solicitation (IC 35-42-4-6).

    (G) Child seduction (IC 35-42-4-7).

    (H) Kidnapping (IC 35-42-3-2), if the victim is less than eighteen (18) years of age and the person is not the child's parent or guardian.

    (I) Attempt to commit or conspiracy to commit an offense listed in clauses (A) through (H).

    (J) An offense in another jurisdiction that is substantially similar to an offense described in clauses (A) through (H).

(c) As used in this section, "instant messaging or chat room program" means a software program that requires a person to register or create an account, a username, or a password to become a member or registered user of the program and allows two (2) or more members or authorized users to communicate over the Internet in real time using typed text. The term does not include an electronic mail program or message board program.

(d) As used in this section, "social networking web site" means an Internet web site that:

    (1) facilitates the social introduction between two (2) or more persons;

    (2) requires a person to register or create an account, a username, or a password to become a member of the web site and to communicate with other members;

    (3) allows a member to create a web page or a personal profile; and

    (4) provides a member with the opportunity to communicate with another person.

---

[1]     A sexually violent predator is a person convicted of offenses designated in Indiana Code § 35-38-1-7.5(b) or a person who has been found after a court proceeding to have such a status.  IND. CODE § 35-38-1-7.5(e).

The term does not include an electronic mail program or message board program.

(e) A person described in subsection (b) who knowingly or intentionally uses:

> (1) a social networking web site; or

> (2) an instant messaging or chat room program;

that the offender knows allows a person who is less than eighteen (18) years of age to access or use the web site or program commits a sex offender Internet offense, a Class A misdemeanor. However, the offense is a Class D felony if the person has a prior unrelated conviction under this section.

(f) It is a defense to a prosecution under this section that the person:

> (1) did not know that the web site or program allowed a person who is less than eighteen (18) years of age to access or use the web site or program; and

> (2) upon discovering that the web site or program allows a person who is less than eighteen (18) years of age to access or use the web site or program, immediately ceased further use or access of the web site or program.

*Social networking websites and instant messaging and chat room programs*

At the current time, we are living through an "Information Revolution," where extraordinary advances in information technologies makes it possible to create, store, and share huge amounts of information. (Affidavit of Fred H. Cate, J.D. [filed on this date] ¶ 9). This revolution began with the widespread use of electronic communications tools, such as email, and the commercial availability in 1990 of the World Wide Web and the related expansion in access to the global internet. (*Id.* ¶ 10).

In the last decade, however, the hallmark of the Information Revolution has been the proliferation of "social media" with the advent of MySpace, Facebook, Twitter, YouTube, Google Plus, and hundreds of other applications that allow persons to interact with each other digitally. (*Id.* ¶ 12). The term "social media" refers to web-based and mobile applications that allow users to interact with each other both individually and in groups. (*Id.* ¶ 13). Typically these

applications allow users to create and/or participate in virtual communities that share common interests. (*Id.*). The communities may be focused on an individual (*e.g.*, a famous person), common interests (*e.g.* photography or music), shared experiences (*e.g.* attending the same college or church, or having read the same newspaper article), particular ambitions or desires (*e.g.*, looking for employment or dating sites), or other orienting features. (*Id.*).

Scholars typically divide social media into six broad categories: social networking sites such as Facebook; blogs and microblogs such as Twitter; content communities such as You Tube; collaborative projects such as Wikipedia; virtual game worlds such as World of Warcraft; and virtual social worlds such as Second Life. (*Id.* ¶ 14).  Regardless of the type, social media sites almost always require users to register to contribute material, and often require registration to access material. (*Id.* ¶ 15).  Registration will require the potential user to create an account with a distinctive username and password. (*Id.*). Almost all social media sites depend heavily on digital communication tools in addition to stand-alone email programs so that members can engage in real-time communications with themselves, either individually or in groups. (*Id.* ¶ 16).

Although Indiana Code § 35-42-4-12 excludes from its prohibition social networking sites, instant messaging and chat room programs that prevent persons from accessing or using the sites or programs, this is not a meaningful exclusion. (*Id.* at ¶ 24). For one thing, it is effectively impossible for a website, much less a third-party user, to verify age on the internet.  (*Id.*). Therefore, as a practical matter, there is no way to prevent someone under the age of 18 from using a site if the person lies about his or her age. (*Id.*).  Additionally, many social media sites allow minors to join and participate. (*Id.* ¶ 25).  For example, Facebook, Google Plus, and

Twitter allow minors 13 years or older to register and use the sites. (*Id.*).[2]  LinkedIn, a popular social networking site for business professionals, requires a person to be 18 to create a profile, but allows partial profiles to be accessed by persons of any age.  (*Id.*)

The number of persons in the United States using social networking sites is enormous. (*Id.* ¶ 28).  For example, a June 2011 report by the Pew Internet & American Life Project of the Pew Research Center found that 79% of American adults used the internet and of this number, 59%, representing 47% of all adults, said that they used at least one social networking site.  (*Id.*). This was almost twice the use of social networking sites that was reported in 2008.  (*Id.*).

At the current time, the most popular social networking site, by far, is Facebook.  (*Id.* ¶ 29).  To use this site a person must register and create an account and then the user must create a personal profile.  (*Id.*  ¶ 30).  This allows the user to then communicate with other persons who are "friends."  (*Id.*).  Worldwide, at the end of 2011, Facebook had 845 million active users. (*Id.* ¶ 31). The largest number, more than 155 million persons as of February 24, 2012, are in the United States, representing slightly more that 50% of the population. (*Id.*).  In Indiana there are 3.1 million persons, slightly less than 50% of the population, who use Facebook. (*Id.* ¶ 32).

More and more Facebook is becoming a "gateway," requiring Facebook use to access other points on the internet. (*Id.* ¶ 33).  For example, in an effort to make it easier to identify persons who post comments, many newspapers require a Facebook account in order to post comments to articles.  (*Id.*).  This is the approach taken by the *Indianapolis Star* as well as, for example, the *Los Angeles Times* and the *New York Post*.  (*Id.*).  Moreover, Facebook is necessary to register for an increasing variety of discussions on the internet ranging from such things as political teleconferences, public library discussion groups, coupons, and a variety of services for

---

[2]   The frequency with which age limits on sites are ignored, and the impossibility of enforcing such restrictions can be seen from the fact that it is reported that 7.5 million children in the United States who are under the age of 13 have Facebook accounts.  (*Id.* ¶ 26).

arranging events, and sharing information.  (*Id.* ¶ 34).  Facebook is increasingly integrated with other websites and services.  (*Id.* ¶ 35).  For example, in 2011 more than 2.5 million websites featured the Facebook "Like" button that allows a person to share content with his or her Facebook "friends." (*Id.*).

Another extremely popular social networking site, with more than 465 million accounts globally and 107.7 million in the United States, is Twitter.  (*Id.* ¶¶ 36-37).  Twitter allows users to send "tweets," text messages of up to 140 characters, which are then received by the user's "followers."  (*Id.* ¶ 36).   To join, a person must create a password, account, and username.  (*Id.*).  Like Facebook, Twitter is not just an entertainment tool, but is used to contribute to important political and cultural discussions. (*Id.* ¶ 38).

Social networking sites are used by businesses to advertise and to hire new employees.  (*Id.* ¶ 39).  It was estimated that in 2011, 89% of all companies would used social media to recruit potential employees.  (*Id.*).

Social networking sites, instant messaging and chat room programs are used by an increasing number of persons to receive news and other information – becoming substitutes for newspapers and older forms of communication. (*Id.* ¶ 40).  They are also used by many for political and religious associations and to promote political engagement as well as social support.  (*Id.* ¶¶ 41-43).

Therefore, social media and the communication tools that they provide are the fastest growing means of accessing information and participating in political, social, cultural, and commercial discourse in the United States today.  (*Id.* ¶ 44). And, they are increasingly critical for persons to participate in this discourse; searching for jobs; obtaining information on

candidates, companies or other organizations; commenting effectively on current events; and maintaining contacts with friends and family members. (*Id.*).

*John Doe*

John Doe, an adult resident of Indianapolis, was arrested in Marion County in 2000 and was convicted of two counts of child exploitation. (Affidavit of John Doe [Doc. No. 6-1] ["Doe. Aff.] ¶¶ 2-3). He was released from prison in 2003 and released from probation in 2004 and is not currently on any form of supervised release. (*Id.* ¶¶ 4-6). He has not been convicted of any offenses since his convictions for child exploitation. (*Id.* ¶ 6).

Pursuant to Indiana law Mr. Doe is required to register on Indiana's sex and violent offender registry as a sex offender for the remainder of his life. (*Id.* ¶ 7). And, inasmuch as child exploitation (Indiana Code § 35-42-4-4(b)) is one of the offenses noted in Indiana Code § 35-42-4-12, and he is not subject to any of the exemptions in Indiana Code § 35-42-4-12(a), this means that Mr. Doe is precluded from ever accessing a social networking web site, instant messaging program or chat room program if the site or program can be used or accessed by a person under the age of 18. (*Id.* ¶ 10).

Mr. Doe would like to access such web sites and programs for legitimate and lawful reasons. (*Id.* ¶ 9). Mr. Doe has legal and physical custody of his son, a young teenager. (*Id.* ¶ 13; Second Affidavit of John Doe [filed on this date] ["Doe 2nd Aff."] ¶ 4]). One of the primary reasons that he wishes to be able to visit social networking sites is to supervise the actions and activities of his son who is on Facebook and has already had questionable "friend" requests that Mr. Doe cannot investigate. (Doe 2nd Aff. ¶ 4). As Mr. Doe's son gets older he will be spending more and more time on these sites and Mr. Doe will not be able to provide the necessary monitoring and supervision. (*Id.*).

Additionally, the challenged law has severely compromised Mr. Doe's ability to participate in politics and political speech because he is unable to use social networking web sites, instant messaging or chat room programs.  (*Id.* ¶ 5).  For example, recently NBC sponsored a debate of the Republican presidential candidates and allowed questions to be posed to the candidates, but only through Facebook. (*Id.*).  He wished to send questions to the candidates, but he was unable to do so.  (*Id.*).  He would like to access the Facebook pages of the President, Governor, and Mayor, but he cannot do so.  (*Id.* ¶ 6).

Mr. Doe would like to be able to comment, and engage in discussions, about news stories in the local and national media.(*Id.* ¶ 7). However, many of these sites, including, as indicated previously, the *Indianapolis Star*, require that comments be made through Facebook. (*Id.*). Additionally, many of the political and other causes that he supports sponsor petitions on Facebook and he is unable to electronically sign these (*Id.* ¶ 8).

Mr. Doe is a small business owner.  (*Id.* ¶ 11). There is an enormous benefit for a business owner to be able to appear on social networking sites both for the purpose of advertising as well as for networking.  (*Id.*).  He cannot put his profile on LinkedIn or Facebook and is greatly disadvantaged by this as he is losing potential clients and customers.  (*Id.*).

Mr. Doe's family is spread out over the western part of the United States. (*Id.* ¶ 10).  His family will post family photographs and videos on Facebook so that the entire family can view them and can communicate.  (*Id.*).  However, he is unable to participate in this and is therefore unable to share events in his life and his son's life. (*Id.*).

Mr. Doe is a pilot and a member of the Aircraft Owner's and Pilot's Association and he is unable to participate in important communications and petitions of interest to pilots because the petitions and communications require that he go on social networking sites. (*Id.* ¶ 9).

To summarize, Mr. Doe desires to be able to access social networking sites, instant messaging and/or chat room programs, to which persons under the age of 18 have access, for legitimate reasons.  (*Id.* ¶ 12).  However, he is unable to do this because of Indiana Code § 35-42-4-12.  (*Id.*).

## Argument

Indiana Code § 35-42-4-12 prohibits communications and associations that receive the highest protections under the First Amendment.   The blanket prohibition enacted by the statute does not stand up to the scrutiny demanded by the First Amendment.  A preliminary injunction must issue to prevent the law's enforcement.

I. **Mr. Doe and the class will prevail on the merits of this case in that Indiana Code § 35-42-4-12(e) plainly violates the First Amendment**

    A. **The challenged statute affects various rights secured by the First Amendment − the right to communicate, the right to receive information, and the right to associate**

        1. **Indiana Code § 35-42-4-12(e) affects the right of Mr. Doe and the class to communicate**

The First Amendment, of course, protects "the right of every citizen to reach the minds of willing listeners."  *Hill v. Colorado*, 530 U.S. 703, 728 (2000) (internal quotation and citation omitted).  The First Amendment protects the various methods of communication.  *See, e.g., Meyer v. Grant*, 486 U.S. 414, 424 (1988) ("The First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing.").  Therefore, the "usual rule [is] that governmental bodies may not prescribe the form or content of individual expression."  *Cohen v. California*, 403 U.S. 15, 24 (1971).  "The constitutional right of free expression is . . . designed and intended to remove governmental

restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us." *Id.*

The instrumentalities of free speech, protected by the First Amendment, include the many means of expression present in the computer age.  In *Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997), the Court, in the course of finding provisions of the Communications Decency Act to be unconstitutional, stressed that internet communications are entitled to the highest protection under the First Amendment.   It noted that the internet:

> provides relatively unlimited, low-cost capacity for communication of all kinds.  .
> .  This dynamic, multifaceted category of communications includes not only
> traditional print and news services, but also audio, video, and still images, as well
> as interactive, real-time dialogue.  Through the use of chat rooms, any person with
> a phone line can become a town crier with a voice that resonates farther than it
> could from any soapbox.  Through the use of Web pages, mail exploders, and
> newsgroups, the same individual can become a pamphleteer.  As the District
> Court found, "the content on the Internet is as diverse as human thought." . . . We
> agree with its conclusion that our cases provide no basis for qualifying the level of
> First Amendment scrutiny that should be applied to this medium.

*Id.* at 870.  Thus "[t]he Supreme Court has also made clear that First Amendment protections for speech extend fully to communications made through the medium of the internet."  *Doe v. Shurtleff,* 628 F.3d 1217, 1222 (10th Cir. 2010), *cert. denied,* − U.S. −, 131 S.Ct. 1617 (2011) (citing *Reno*, 521 U.S. at 870).  *See also, e.g., District of Columbia v. Heller*, 554 U.S. 570, 582 (2008) ("[T]he First Amendment protects modern forms of communication." [citing *Reno*, 521 U.S. at  849]).

The effect of the challenged statute here is clear.  By absolutely denying Mr. Doe and the class the ability to access social networking and other sites it denies them communication rights protected by the First Amendment.

      **2.**      **Indiana Code § 35-42-4-12(e) affects the right of Mr. Doe and the class to receive information**

Internet communications are protected by the First Amendment not only because of their communicative nature, but because the First Amendment safeguards the "right to 'receive information and ideas.'" *Kleindienst v. Mandel*, 408 U.S. 753, 763 (1972) (internal citation omitted). *See also Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (same); *City of Watseka v. Illinois Public Action Council*, 796 F.2d 1547, 1577 (7th Cir. 1986) (same).

> This right is an inherent corollary of the rights of free speech and press that are explicitly guaranteed by the Constitution in two senses. First, the right to receive ideas follows ineluctably from the *sender's* First Amendment right to send them. . . .
>
> More importantly, the right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom.

*Board of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (plurality) (emphasis in original).

This right to receive information, protected by the First Amendment, necessarily includes the right to receive information via the internet. In *Miller v. Northwest Region Library Board*, 348 F. Supp. 2d 563 (M.D. N.C. 2004), the court concluded that a public library patron who had been banned from using a public library's computers had properly alleged a denial of his First Amendment "'right of public access to information and ideas.'" *Id.* at 570 (quoting *Kreimer v. Bureau of Police for the Town of Morristown*, 958 F.2d 1242, 1255 (3rd Cir. 1992)). This right, secured by the First Amendment, is denied to Mr. Doe and the class because of the challenged statute.

3.   **Indiana Code § 35-42-4-12(e) impinges on associational rights secured by the First Amendment**

"Implicit in the First Amendment freedoms of speech, assembly, and petition is the freedom to gather together to express ideas – the freedom to associate." *Christian Legal Society*

*v. Walker*, 453 F.3d 853, 861 (7th Cir. 2006).  This is because the explicit rights mentioned in the First Amendment, "to speak, to worship, and to petition the government . . . . could not be protected unless a 'correlative freedom to engage in group effort toward those ends' is also guaranteed."  *Klug v. Chicago School Reform Bd. of Trustees*, 197 F.3d 853, 857 (7th Cir. 1999) (quoting *Roberts v. United State Jaycees*, 468 U.S. 609, 622 (1984)).

The First Amendment therefore protects and secures "association for the advancement of beliefs and ideas."  *NAACP v. Alabama*, 357 U.S. 449, 460 (1958).  This includes "the freedom to join together in furtherance of common political beliefs," *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 214 (1986), as well as to join together "for the purpose of engaging in [other] activities protected by the first amendment, such as the exercise of speech, assembly and religion."  *Rode v. Dellarciprete*, 845 F.2d 1195, 1204 (3rd Cir. 1988) (citing *Roberts*, 468 U.S. at 617-18).

Indiana Code § 35-42-4-12(e) prohibits Mr. Doe and the class from engaging in political association, or other forms of expressive association, on social networking sites.  However, it is precisely these sites that are being used in the 21st Century to allow "persons to gather together to express ideas."  *Christian Legal Society*, 453 F.3d at 861.  *See*, *e.g.*, Obama-Biden, www.barackobama.com (last visited on Feb. 7, 2012) (noting opportunities to communicate with others via Facebook or Twitter, among other methods); Mitt Romney for President, http://www.mittromney.com/ (noting under "Connect with Mitt" both Facebook and Twitter links) (last visited on Feb. 7, 2012); United States Conference of Catholic Bishops, http://usccb.org (noting under "Share: opportunities to communicate through Facebook, LinkedIn, Twitter, among others) (last visited on Feb. 7, 2012); Union for Reform Judaism,

http://urj.org/connect/ (noting under "Connect" opportunities to communicate via Facebook Linkedin, Twitter, or to comment via blogs).

It is therefore apparent that the challenged statute impinges on the association rights of Mr. Doe and the members of the class.

### B.     Although the statute is content neutral, it fails the requisite scrutiny

#### 1.     Inasmuch as the statute is content-neutral, it is nevertheless subject to demanding scrutiny

The most rigorous scrutiny under the First Amendment is reserved for content-based regulations of expression.  In such a situation the regulation is "'presumptively invalid' and subject to strict scrutiny," *Yursa v. Pocatello Educ. Ass'n*., 555 U.S. 353, 358 (2009), requiring the defendant to demonstrate that the regulation is "(1) narrowly tailored, to serve (2) a compelling state interest." *Republican Party of Minnesota v. White*, 536 U.S. 765, 775 (2002) (plurality).

A content-neutral speech regulation is one that is "justified without reference to the content of the regulated speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (internal citation and emphasis omitted).  Thus, "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral." *Id.*  The challenged statute presumably has as its purpose the protection of children from potential predators on social networking sites.  This is a purpose unrelated to the content of the expression and renders the statute content neutral.  *See e.g.*, *Doe v. Nebraska*, 734 F. Supp. 2d 882, 911 n.35 (D. Neb. 2010) (assuming that a statute that, among other things, denies certain sex offenders from accessing certain social networking sites, instant messaging or chat room services "should be deemed 'content neutral' for the purposes of First Amendment analysis").  A content neutral regulation can be upheld only if it is narrowly tailored to serve a significant government interest as well as leaving open ample

alternative channels for communication.  *Ward*, 491 U.S. at 791.  In such a case the regulation is deemed to be a "reasonable time, place and manner regulation[ ]."  *United States v. Grace*, 461 U.S. 171, 178 (1983).

As indicated below, the challenged statute fails traditional "content neutral" analysis. However, regardless of content neutrality, many of the Supreme Court's "decisions have voiced particular concern with laws that foreclose an entire medium of expression."  *City of Ladue v. Gilleo*, 512 U.S. 43, 54 (1994) (citing to:  *Frisby v. Schultz*, 487 U.S. 474, 486 (1988); *Schad v. Mount Ephraim*, 452 U.S. 61, 75-76 (1981); *Martin v. City of Struthers*, 319 U.S. 141, 145-149 (1943); *Jamison v. Texas*, 318 U.S. 413, 416 (1943); *Schneider v. State (Town of Irvington)*, 308 U.S. 147, 164-165 (1939); *Lovell v. City of Griffin*, 303 U.S. 444, 451-452 (1938)).   The challenged statute here is such a law in that it completely bans the sex offenders subject to it from accessing specified forms of expression. "Although prohibitions foreclosing entire media may be completely free of content or viewpoint discrimination, the danger they pose to the freedom of speech is readily apparent – by eliminating a common means of speaking, such measures can suppress too much speech."  *Id.* at 55.

This warning about total bans on a particular form of expression has caused one circuit court to question whether a statute enacting such a ban is *per se* unconstitutional despite its content-neutral nature.  *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1063-64 (9th Cir. 2010) (finding facially unconstitutional an ordinance that effectively totally banned tattooing). However, the court in *Anderson* concluded that this question did not need to be answered given that the regulation clearly failed traditional "time, place, and manner" analysis.  *Id.* at 1064. Similarly, there is no need to go beyond the intermediate scrutiny demanded of content-neutral legislation in this case, as the challenged statute fails this analysis.

### 2. The statute is not narrowly tailored

In *Ward* the Court clarified:

> that a regulation of the time, place or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." . . . To be sure, this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests.  Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals. . . So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.

491 U.S. at 798-99 (internal citations and footnotes omitted).  It is the duty of the government to

demonstrate the actual reasons for the particular regulation on First Amendment rights.

> When the government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply "posit the existence of the disease sought to be cured."  *Quincy Cable TV, Inc. v. FCC,* 768 F.2d 1434, 1455 (CADC 1985).  It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.  *See Edenfield v. Fane,* 507 U.S. 761, 770-71 (1993); *Los Angeles v. Preferred Communications, Inc.,* 476 U.S. at 496 ("This Court may not simply assume that the ordinance will always advance the asserted state interests sufficiently to justify abridgement of expressive activity.")

*Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 664 (1994).  This is not a "*de minimis*"

standard.  *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 77 (1981) (Blackmun, J.,

concurring).

The general purpose of laws regulating sex offenders is to protect the public.  *Smith v.

Doe*, 538 U.S. 84, 99 (2003) ("The purpose and principal effect of [sex offender registry]

notification are to inform the public for its own safety."); *Wallace v. State*, 905 N.E.2d 371, 375-

76 (Ind. 2009) (noting that Indiana's sex offender laws were originally intended "to protect

children from sex offenders" although the original notification and registration requirements have expanded). Although no purpose is explicitly articulated in the challenged statute, the plaintiffs concede that "[t]here can be no doubt that the state has a wholly legitimate interest in protecting children from sex offenders online." *Doe v. Jindal*, − F. Supp. 2d −, 2012 WL 540100 at *6 (M.D. La. Feb. 16, 2012) (granting a permanent injunction against Louisiana statute that barred certain sex offenders from social networking sites). Although the Prosecutor in this case can certainly articulate a legitimate interest, the challenged statute is far from narrowly tailored.

The vast breadth of the challenged statute's reach is obvious. Persons convicted of the enumerated offenses, perhaps decades before, cannot make comments concerning current events in the *Indianapolis Star*, cannot communicate with peers and potential clients and employers on sites such as LinkedIn, cannot participate in discussions on religious and political issues on chatrooms and others sites, cannot share photos and group discussion with family member. This absolute ban is imposed even on persons whose offenses did not involve social networking sites or even the internet. Indeed, inasmuch as the ban is applied to persons who committed rape of an adult (and therefore is a sexually violent predator pursuant to Indiana Code § 35-38-1-7.5(b)(1)(A)) or kidnapping of a child, the ban is applied to persons who did not even commit sex offenses against children.

In *United States v. Miller*, 594 F.3d 172 (3rd Cir. 2010), the court vacated a special condition of supervised release on a person who had been convicted of receiving child pornography that had banned his internet use as being too broad. The court summarized its prior cases that discussed the validity of computer and internet restrictions on child pornography offenders and stated "[i]n general, our precedent recognizes that such, as they bear on tools that are essential in modern life for legitimate purposes of communication, commerce and

information-gathering, must be narrowly tailored according to the context of the particular offense." *Id.* at 185.  The condition was deemed outside the bounds of 18 U.S.C. § 3583(d), which limits the conditions of release to those that "involve[] no greater deprivation of liberty than is reasonably necessary." 594 U.S. at 188.

In *United States v. Peterson*, 248 F.3d 79, 81 (2nd Cir. 2001), a defendant who plead guilty to bank larceny and who had an unrelated sex offense conviction was barred, as a condition of probation, from possessing or using computers or the Internet. The court found that this restriction was overbroad, and therefore violated the requirements of 18 U.S.C. § 3563(b), that probation conditions be "reasonably necessary" and "reasonably related" to mandatory probation conditions and sentencing needs.

> We believe the breadth of the restrictions on computer and Internet use made those restrictions excessive.  The computer/Internet restrictions prohibit the defendant outright from possessing or using a computer that includes either a modem, an Internet account, a mass storage devise, or a writable or re-writable DC rom.  Computers and Internet access have become virtually indispensable in the modern world of communications and information gathering.  The fact that a computer with Internet access offers the possibility of abusive use for illegitimate purposes does not, at least in this case, justify so broad a prohibition.  *See United States v. White,* 244 F.3d 1199, 1206 (10th Cir. 2001) (computer restriction which "would bar [defendant] from using a computer at a library to do any research, get a weather forecast, or read a newspaper online" was excessively broad).

*Id.* at 83.

The Seventh Circuit has also noted that indiscriminately imposing internet restrictions as a condition of supervised release was overbroad.  In both *United States v. Holm*, 326 F.3d 872 (7th Cir. 2003) and *United States v. Scott*, 316 F.3d 733 (7th Cir. 2003), the Court reversed supervised release conditions that restricted internet access as overbroad and in violation of 18 U.S.C. § 3563(b).  In *Holm* the court noted that the ban was "overly broad if construed as a strict ban on Internet access.  While parolees typically have fewer constitutional rights than ordinary

persons . . . this is the early 21st century equivalent of forbidding all telephone calls, or all newspapers." 326 F.3d at 878-79.   The lack of tailoring of an internet ban was emphasized in *Scott,* where the court acknowledged other cases, including *Peterson* and *White*, that stand for the proposition:

> that because the Internet is a medium of communication a total restriction rarely could be justified.  The Internet is a vast repository, offering books, newspapers, magazines and research tools along with smut.  A judge who would not forbid Scott to enter a video rental store (which may have an adult-video section) also should not forbid Scott to enter the Internet, even though Disney's web site coexists with others offering filthy pictures or audio files. . . A judge who would not forbid a defendant to send or receive postal mail to use the telephone should not forbid that person to send or receive email or to order books at Amazon.com.

316 F.3d at 737.

A number of obvious lessons can be drawn from these cases.  First, although they are not First Amendment cases, they demonstrate a clear concern about the limitation of communication options unless specifically necessary, even though the defendant may have been convicted of a sex offense. Second, the courts are making this determination in the context of conditions of supervised release, where constitutional rights are compromised as compared to those of persons who are released from prison without conditions. *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972) ("[T]he State properly subjects [the parolee] to many restrictions not applicable to other citizens").  Third, although these cases concern a denial of internet access, not denial of access to social networking sites, they demonstrate that the "total restriction" of "a medium of communication . . .  rarely could be justified."  *Scott*, 316 F.3d at 737,

With the supervised release cases as a backdrop, the lack of adequate tailoring of the challenged statute is clear.  For it cuts off large swaths of communication methods solely because of past convictions, even though the crimes had nothing to do with social networking sites and even though the crimes were decades before. It also prohibits Mr. Doe and class members from

accessing sites to discuss current events, politics, religion and other matters with adults. Clearly. the challenged statute is "substantially broader than necessary to achieve the government's interest." *Ward*, 491 U.S. at 799.

Of course, Indiana has an interest in prohibiting the solicitation of children on-line. However, this is already made a crime in Indiana. IND. CODE § 35-42-4-6(a)(4). The challenged statute here does nothing but include within its ambit, and criminalizes, innocent communicative activity. The challenged statute is not narrowly tailored.[3]

### 3. The statute does not leave open alternative channels of communication

"An adequate alternative does not have to be the speaker's first or best choice . . . or one that provides the same audience or impact for the speech." *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000). But, the "alternative must be more than merely theoretically available. It must be realistic as well . . . Furthermore, an adequate alternative cannot totally foreclose a speaker's ability to reach one audience even if it allows the speaker to reach other groups." *Id.*

The challenged statute totally forecloses various methods of communication. If Mr. Doe or class members wish to engage in a discussion with others commenting on an *Indianapolis Star* article, they cannot do so. If Mr. Doe or class members wish to discuss current events with others from around the country, they cannot do so. If they wish to follow a political candidate who uses Facebook as the primary means of staying in touch with supporters, they will not be able to do

---

[3]      In *Doe v. Nebraska*, the court denied both parties' summary judgment motions on the issue of the constitutionality of a statute that denied certain sex offenders access to social networking sites, finding that evidence was necessary on the question of whether the statute was narrowly tailored. 734 F. Supp. 2d at 911-12. The court's rationale is not clear in that "[i]n First Amendment cases, application of the least-restrictive-means (or 'narrow tailoring') test to a given set of facts is well understood to be a question of law." *United States v. Friday*, 525 F.3d 938, 949 (10th Cir. 2008) (citing *Am. Target Adver., Inc. v. Giani*, 199 F.3d 1241, 1249 (10th Cir. 2000); *United States v. Doe*, 968 F.2d 86, 88 (D.C. Cir. 1992). The court in *Doe v. Nebraska* gave a number of examples that appear to demonstrate that the statute was not narrowly tailored. *Doe*, 734 F. Supp. 2d at 912.

so. What substitutes do they have? They can write a letter to the *Indianapolis Star* or follow their candidate in the news, but they will not be able to engage in the give-and-take dialogue that comments via Facebook or other sites engender and allow. They can try to meet with people to have a discussion group, but the virtue of social networking sites is that they allow spontaneous discussions to spring up among like-minded persons around the country, if not the globe. In *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048 (7th Cir. 2004), the court, applying intermediate-scrutiny, found that a juvenile-curfew law did not provide adequate alternatives to minors who were forbidden from engaging in First Amendment activities during the curfew times, despite the fact that the minors could exercise their First Amendment rights in other, more remote, ways. *Id.* at 1062. The court noted that "'[t]he First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it,' . . . And although an adequate alternative for expression does not have to be the speaker's best or first choice, it must provide the speaker with sufficiently adequate alternatives." *Id.* at 1063 (quoting *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 790-91 (1988)). If a person today wants to participate in discussions and networking with a large number of persons on an informal and easy basis, their only means of doing so is through social networking sites. The challenged statute therefore does not leave open adequate alternative channels of communication.

### C.    The statute is also unconstitutional because it is substantially overbroad

In *United States v. Stevens*, − U.S. − , 130 S.Ct. 1577 (2010), in finding that a federal law that criminalized the creation, sale, or possession of certain depictions of animal cruelty was facially unconstitutional, the Court reiterated the contours of the overbreadth doctrine. The Court noted that "a law may be invalidated as overbroad if 'a substantial number of its

applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* at 1587 (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).[4]

"The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statue reaches too far without first knowing what the statute covers." *Williams*, 553 U.S at 293.  As is indicated above, the challenged statute "create[s] a criminal prohibition of alarming breadth." *Stevens*, 130 S.Ct. at 1588.  It criminalizes a wide array of modern communication methods that many consider essential in the 21st century.  The second step in the analysis is similarly simple in that it requires this court to determine if "the statute, as we have construed it, criminalizes a substantial amount of protected expressive activity." *Williams*, 553 U.S. at 297.  The statute reaches an enormous amount of protected activity, from the devout Catholic who wishes to follow and communicate with the Pope via Twitter[5] or Facebook[6]; to the Tea Party adherent who wants to communicate with persons of similar viewpoints[7]; to the business person who wants to network via LinkedIn; to the sports

---

[4]    The Court has noted that the overbreadth:

   doctrine seeks to strike a balance between competing social costs. . .  On the one hand, the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas. On the other hand, invalidating a law that in some of its applications is perfectly constitutional— particularly a law directed at conduct so antisocial that it has been made criminal—has obvious harmful effects. In order to maintain an appropriate balance, we have vigorously enforced the requirement that a statute's overbreadth be *substantial,* not only in an absolute sense, but also relative to the statute's plainly legitimate sweep.

*United States v. Williams*, 553 U.S. 285, 292-93 (2008).

[5]    @Pope2YouVatican

[6]    http://www.facebook.com/pages/Joseph-Ratzinger-Pope-Benedict-XVI/79252565962

[7]    http://www.facebook.com/teapartypatriots.

enthusiast who wants to follow his or team and commiserate with fellow fans via the internet; to the person who wants to follow Indiana's Governor.[8]   The possibilities are as numerous as the ever-expanding boundaries of social media.

In *Doe v. Jindal*, the court found that the challenged statute, barring certain sex offenders who had committed crimes against children from accessing social networking sites, chat rooms, and peer-to-peer networks, was unconstitutionally overbroad.  2012 WL 540100 at *1, *6.  The court concluded that:

> [t]here can be no doubt that the state has a wholly legitimate interest in protecting children from sex offenders online.  However, the state's interests "can [only] be served by a narrowly drawn statute tailored precisely toward the conduct the [state] wishes to proscribe."  In its current form, the Act is not crafter precisely or narrowly enough – as is required by constitutional standard – to limit the conduct it seeks to proscribe.  Accordingly, on its face . . . the Act is substantially overbroad and, therefore, invalid under the First Amendment.

*Id.* at * 6.  The same is true here.

## II.    All other requirements to obtain a preliminary injunction are met

As this Court has noted, "[w]hen a party seeks a preliminary injunction on the basis of a potential First Amendment violation, the likelihood of success on the merits will often be the determinative factor."  *Planned Parenthood of Indiana, Inc. v. Commissioner of Indiana State Dept. of Health*, 794 F. Supp. 2d 892, 920 (S.D. Ind. 2011), *app. pending*.  However, it is readily apparent that the remaining requirements for the grant of a preliminary injunction are met here as well.

### A.    Without an injunction the plaintiff and the class will be caused irreparable harm for which there is no adequate remedy at law

The violation of the First Amendment, for even "minimal periods of time"   is "unquestionably . . . irreparable injury."  *Elrod v. Burns,* 427 U.S. 347, 373 (1976) ( plurality).

---

[8]        On  Twitter at @mymanmitch and at Facebook at http://www.facebook.com/MyManMitchFans.

And, "[i]t has repeatedly been recognized by the federal courts at all levels that violation of constitutional rights constitutes irreparable harm as a matter of law."  *Cohen v. Coahoma County, Miss.,* 805 F. Supp. 398, 406 (N.D. Miss. 1992) (granting a preliminary injunction to prevent sheriff from using illegal force to extract information from prisoners).  As indicated above, the challenged statute violates the First Amendment rights of the plaintiff and the class. This is irreparable harm

  **B.**  **The balance of harms favor the plaintiff and the class**

  The Marion County Prosecutor, whose duty it is to enforce Indiana Code § 35-42-4-12 and prosecute Mr. Doe and class members in the event of a violation of the law, will not be harmed by a preliminary injunction that will relieve him from the responsibility of enforcing an unconstitutional statute.  On the other hand, without an injunction Mr. Doe and the class members are facing irreparable harm.  The balance of harms favor the plaintiff and the class.

  **C.**  **The public interest will be served by the issuance of an injunction**

  "The public has an interest in the protection and preservation of First Amendment rights. 'Vindication of constitutional freedoms and protection of First Amendment rights is in the *public interest.*'"  *McIntire v. Bethel School Independent School District, No. 3,* 804 F. Supp. 1415, 1429 (W.D. Okl. 1992) (quoting *Albright v. Board of Education of Granite School District,* 765 F. Supp. 682, 686-87 (D. Utah 1991)) (emphasis in original).  The public interest will be served by the grant of this injunction.

  **D.**  **The injunction should issue without bond**

  The defendant is not facing any financial risk or injury if an injunction is granted.  In the absence of such injury, no bond should be required.  *See, e.g., Doctor's Associates, Inc. v. Stuart*, 85 F.3d 975, 983 (2nd Cir. 1996).

## Conclusion

Indiana Code § 35-42-4-12 burdens an enormous amount of activity and associations protected by the First Amendment.  It is unconstitutional on its face and a preliminary injunction should be entered preventing its continued enforcement.

/s/ *Kenneth J. Falk*
Kenneth J. Falk
No. 6777-49
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059 ext. 104
fax: 317/635-4105
kfalk@aclu-in.org

Attorney for Plaintiffs

## Certificate of Service

I hereby certify that on this  14th day of March, 2012, a copy of the foregoing was filed electronically with the Clerk of this Court.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system and the parties may access this filing through the Court's system.

David A. Arthur
Deputy Attorney General
david.arthur@atg.in.gov

Kate E. Shelby
Deputy Attorney General
kate.shelby@atg.in.gov

/s/ *Kenneth J. Falk*
Kenneth J. Falk
Attorney at Law