UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JOHN DOE, *et al.*, | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
|     v. | ) CAUSE NO. 1:12-cv-0062 TWP-MJD |
| | ) |
| CITY OF INDIANAPOLIS, | ) |
| INDIANA, *et al.*, | ) |
| | ) |
|     **Defendants.** | ) |

**DEFENDANT'S TRIAL BRIEF**

    Defendant Prosecutor, Marion County, urges the court to enter judgment in his favor.

**I. Introduction**

    There is no doubt that predators prowl the internet in search of victims, most often young, vulnerable victims. In *United States v. Henzel*, 668 F.3d 972 (7th Cir. 2012), the judgment of this court was recently affirmed as to the sentence handed to an internet predator who met his 12-year-old victim in an internet chat room and sexually assaulted her in a hotel room. MSNBC's popular show "To Catch a Predator" sadly never seems to run out of material for new episodes. Examples of how sexual predators use the internet to find their victims could fill many pages, perhaps volumes. This court does not need to be inundated with those depressing facts; the point is clear and no subject to serious dispute.

    "Sex offenders are a serious threat in this Nation." *McKune v. Lile*,
536 U.S. 24, 32, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002) (plurality

> opinion). "[T]he victims of sex assault are most often juveniles," and "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be re-arrested for a new rape or sexual assault." *Id.*, at 32-33, 122 S.Ct. 2017. Connecticut, like every other State, has responded to these facts by enacting a statute designed to protect its communities from sex offenders and to help apprehend repeat sex offenders.

*Conn. Dept. of Public Safety v. Doe*, 538 U.S. 1, 4 (2003).

The risk of recidivism by sex offenders is "frighteningly high." *Smith v. Doe*, 538 U.S. 24, 34 (2002), quoting *McKune v. Lile*, 536 U.S. at 32. Because that risk is so high, the Supreme Court has held that civil commitments of sexual predators are constitutionally permissible. *United States v. Comstock*, 130 S. Ct. 1949, 1954 (2010); *Kansas v. Hendricks*, 521 U.S. 346, 356-58 (1997).

With this background in mind, the Indiana General Assembly in 2008 enacted Indiana Code § 35-42-4-12 ("the Act"), which, in pertinent part, prohibits a limited group of convicted registered sex offenders from visiting social networking websites or using instant messaging or chat room programs that allow minors to use or access the website or program. The statute is set out in full in Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction ("Memo"), doc. no. 35, on pages 3 to 5. The prohibition is applicable only to those who are required to register as a sex offender and who either are sexually violent predators or are convicted of listed crimes involving child victims. From this group, others are excluded under subsection (a) of the statute so that it applies only to those who were 21 and used or threatened deadly force, used a weapon or drugs or a controlled substance to commit the crime, caused serious bodily injury or were in a position of

2

authority or substantial influence over the victim.  Certain age differences between offender and victim may also exclude a person so that "Romeo and Juliet" crimes do not bring the offender within the statute.  Therefore, the statute is narrowly directed at those found most likely to commit repeat offenses and who have victimized children.

Such proactive steps to protect children are within the province of a state legislative body.

> The City was not bound to wait until Mr. Doe again committed the crime of child molestation or attempted child molestation in order to act.  It had the power to address Mr. Doe's actions outside the criminal law context and did exactly that. *See Smith*, 538 U.S. at 93, 123 S.Ct. 1140 ("[A]n imposition of restrictive measures on sex offenders adjudged to be dangerous is a legitimate nonpunitive governmental objective and has been historically so regarded." (internal quotation marks and citation omitted)).

*Doe v. City of Lafayette*, 377 F.3d 757, 767 fn. 8 (7th Cir. 2004).  *See also, id.*, at 767 ("They do not need to wait until a child is molested to take steps to protect their children").  *Accord, Bd. of Educ. v. Earls*, 536 U.S. 822, 835-36, (2002) (noting that "the need to prevent and deter the substantial harm of childhood drug use provides the necessary immediacy" and that the school district need not await a "particularized or pervasive drug problem before ... conduct[ing] suspicionless drug testing").

## II.  Factual background

The facts plaintiffs bring to court are not so much wrong as irrelevant.  They present declarations of two academics to the effect that the internet is good and

communication over the internet is broader and faster.  What the two don't and can't say is that the internet is the only way to communicate or to receive or disseminate information.  No such statement could seriously be advanced.

The fact is that telephones still work, people—including registered sex offenders—may still congregate, discuss, debate and even demonstrate, television remains a viable and wide-spread medium, broadcast radio is still free and carries numerous talk radio and other call-in shows, newspapers are still published and accept and print letters to the editor, and communication is not limited to blogs, tweets and posting on ones Facebook "wall."  It would be absurd to suggest—and plaintiffs' declarants do not suggest—that there was no communication until the internet came along, or that, but for the internet, society would never have advanced and wouldn't advance in the future.

This country has communicated without the internet.  The Federalist Papers were published in newspapers in 1787 and 1788, not on the internet.  The responsive Anti-Federalist Papers were also published in newspapers, not posted on a rival web page.  The Lincoln-Douglas Debates were conducted in person and were not exchanges on a blog.  The Gettysburg Address was not tweeted.  On July 4, 1876, Susan B. Anthony presented the Declaration for Rights of Women in front of the Liberty Bell and didn't have to post it on YouTube to get it recognized and widely spread.  It went viral before viral was a good thing.  The United States had elections without the benefit of the internet for 200 years or more before very recent times.  In the 1960's, many, many protests and marches were held across the entire

country and not a single one was an internet-generated flash mob. And when the First Amendment itself was proposed and debated, it was not advanced through a podcast.

There was and is viable and valuable communication independent of the internet, and that fact must be kept in view. The internet might be good, but it is not the sole means of communicating with others or receiving or spreading information.

### III. Applicable Legal Standards

Plaintiffs bring a purely facial challenge to the statute. Facial challenges are strongly disfavored because they "often rest on speculation," and therefore "raise the risk of premature interpretation of statutes on the basis of factually barebones records." *Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 450 (2008) (internal quotation marks and citation omitted). Facial challenges also tempt courts to "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id*. at 451. Finally, facial challenges "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id*.

Plaintiffs' challenge is, in part, that the statute is overly broad. An "overbreadth claimant bears the burden of demonstrating, from the text of [the law] and from actual fact, that substantial overbreadth exists." *Virginia v. Hicks*, 539 U.S. 113, 122 (2003)(internal quotation marks omitted). *Broadrick*, the Supreme

5

Court's seminal overbreadth opinion, instructs that a law will be struck down only where its overbreadth is "substantial . . .judged in relation to the statute's plainly legitimate sweep." *Id.* at 615. Nevertheless, the Court expressed a deep reluctance to "invalidat[e] a statute on its face and so prohibit[] a State from enforcing [it] against conduct that is admittedly within its power to proscribe." *Broadrick,* 413 U.S. at 614. The Court warned that the overbreadth doctrine is "strong medicine" and should be "employed . . . only as a last resort." *Id.* at 613.

A facial challenge is governed by the general rule, established in *United States v. Salerno*, 481 U.S. 739, 745 (1987), that "the challenger must establish that no set of circumstances exists under which the Act would be valid." *See also Horton v.City of St. Augustine, Fla.*, 272 F.3d 1318, 1331-32 (11th Cir. 2001) (discussing application of *Salerno* in First Amendment context).

## IV. The Act is a valid under the First Amendment as a reasonable time, place, or manner regulation

Because internet communications are expressive activity, the Act's restrictions are subject to scrutiny under the First Amendment. *See, e.g., Reno v. ACLU*, 521 U.S. 844, 868-870 (1997) (recognizing expressive dimension of internet activities). It is settled law, however, that "[e]xpression, whether oral or written or symbolized in conduct, is subject to reasonable time, place, or manner restrictions." *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984). Such restrictions are valid if:

> "they are justified without reference to the content of the regulated speech";
> "they are narrowly tailored to serve a significant governmental interest"; and,

>    "they leave open ample alternative channels for communication of the information."

*Id.*; *see also generally Ward v. Rock Against Racism, Inc.*, 491 U.S. 781, 791 (1989).

This is not a strict scrutiny standard. *See, e.g., Ward*, 491 U.S. at 798 n.6 (observing that "we have never applied strict scrutiny in this context"). To the contrary, a time-place-or-manner regulation will pass First Amendment scrutiny "'so long as the … regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Id.* at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)).

This is a classic time, place, or manner regulation because it targets not the content of speech, but rather the place where speech occurs. *Cf. Carey v. Brown*, 447 U.S. 455, 462 (1980) (explaining that, in a content-based restriction, "it is the content of the speech that determines whether it is within or without the statute's blunt prohibition"). Unlike a content based regulation, the Act merely "prohibits [offenders] from communicating with the public in a certain manner." *Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 803 (1984).

### A.  The Act is content-neutral

Plaintiffs concede this point. Memo., p. 15. The Act applies whether the web-based communication is about the weather, the presidential election, conditions in Afghanistan or is a solicitation for sex. The Act is content-neutral.

### B. The Act promotes a compelling government interest in child safety that would be achieved less efficiently without it.

The Act's goal of protecting minors from being targeted on social networking sites by certain registered sex offenders is significant. Indeed, it is compelling. *See, e.g., Sable Communications of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989) (observing that the government has "a compelling interest in protecting the physical and psychological well-being of minors"); *see also, e.g., Smith v. Doe, 538 U.S. at 103* (quoting a 1997 U.S. Department of Justice study noting that "[w]hen convicted sex offenders reenter society, they are much more likely than any of type of offender to be rearrested for a new rape or sexual assault").

When seeking to protect children from predators, the state need not wait until a schoolchild is actually solicited: rather, it can bar predators from going near schools in the first place. *See, e.g., Kennedy v. Louisiana*, 554 U.S. 407, 457 n.5 (Alito, J., dissenting) (collecting residency restriction laws from 12 states); Indiana Code § 35-42-4-11 (prohibiting registered sex offenders from residing within 1,000 feet of a school, park or youth activity center). For the same reason, the State need not wait until a child is solicited by a sex offender on Facebook; rather, it can bar predators from haunting social networking websites in the first place. In both cases, the actual and the virtual neighborhoods are made safer for children by the broader ban.

By its own terms, the Act bars plaintiffs only from a subclass of interactive websites that would allow them essentially to choose from a menu of potential victims. See Ind.Code § 35-42-4-12 (c) and (d), defining prohibited websites as

8

"social networking websites," "chat rooms," and "instant messaging programs." The rest of the internet is open to them, including email and message boards, as well as news and information sites.

### C. The Act leaves open ample alternative means of communication.

A law may be struck down as facially overbroad "if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 130 S.Ct. 1577, 1587 (2010) (quoting *Wash. State Grange*, 552 U.S. at 449 n.6). But "[t]he overbreadth doctrine is 'strong medicine' that is used 'sparingly and only as a last resort.'" *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 14 (1988) (quoting *Broadrick*, 413 U.S. at 613). A law's overbreadth must be "substantial," and "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Bd. of Airport Com'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987) (quotes omitted). But here, the Act manifestly does not criminalize the entire internet for registered child predators. Rather, it seeks to prevent them only from lurking in those interactive precincts of the internet that provide the choicest access to potential victims.

Plaintiffs claim the right to receive information is denied them, claiming that "In *Miller v. Northwest Region Library Board*, 348 F. Supp. 2d 563 (M.D. N.C. 2004), the court concluded that a public library patron who had been banned from using a public library's computers had properly alleged a denial of his First Amendment '"right of public access to information and ideas."'" *Id.* at 570 (quoting

*Kreimer v. Bureau of Police for the Town of Morristown*, 958 F.2d 1242, 1255 (3rd Cir. 1992)). Memo., p. 13. Not so. In that case, the court found a due process violation, not a substantive violation of First Amendment rights. Plaintiffs here do not make a due process claim. That case is of no help to them.

Plaintiffs further claim that "The challenged statute here is such a law in that it completely bans the sex offenders subject to it from accessing specified forms of expression." Memo., p. 16. The plaintiffs repeatedly categorize "forms of expression" as broadly as possible, borrowing language from cases dealing with *complete* internet bans. It's plaintiffs' argument and not the statute that is overly broad. There is no complete ban here, merely a restriction on visiting sites or using programs also used by minors.

Continuing to fail to distinguish between the limited restriction in the Act and cases discussing total bans, plaintiffs argue that "This warning about total bans on a particular form of expression has caused one circuit court to question whether a statute enacting such a ban is *per se* unconstitutional despite its content-neutral nature. *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1063-64 (9th Cir. 2010) (finding facially unconstitutional an ordinance that effectively totally banned tattooing). However, the court in *Anderson* concluded that this question did not need to be answered given that the regulation clearly failed traditional 'time, place, and manner' analysis. *Id*. at 1064." Memo., p. 16. The Ninth Circuit held in *Anderson* that tattooing is purely First Amendment speech. However, the court in *Hold Fast Tattoo LLC v. City of North Chicago*, 580 F.Supp. 2d 656 (N.D.Ill. 2008),

10

held that tattooing is not sufficiently imbued with communicative elements to fall within the scope of the First Amendment.  The Illinois court is correct, in that the act of tattooing does not communicate ideas any more than buying a phone is communication.  Ideas might be communicated by a tattoo or using a phone, but they are not themselves communication.  And, to repeat, the Act is not a total ban on internet access as repeatedly suggested by plaintiffs.  Rather, it is a limited restriction on a limited group of registered convicted sex offenders.

Plaintiffs cite U*nited States v. Holm*, 326 F.3d 872 (7th Cir. 2003) and *United States v. Scott*, 316 F.3d 733 (7th Cir. 2003), in support of their claim of overbreadth, but both were addressing total and strict bans on internet access, not the limited time, place or manner restriction found in the Indiana Act.  The cases say nothing about Indiana's statute.

Plaintiffs' ultimate conclusion on their review of cases restricting access to the internet is that "although these cases concern a denial of internet access, not denial of access to social networking sites, they demonstrate that the 'total restriction' of 'a medium of communication. . . rarely could be justified.' *Scott*, 316 F.3d at 737."  Memo., p. 20.  However, social networking is not a "medium of communication" but a location (virtual though it be) of communication and, in any event, there is no "total restriction" on internet access under the Act but only a restriction on visiting certain sites that are also accessible to minors, where the registered convicted sex offenders could access not only the internet but also the children.

Continuing with their theme that the limited restriction is instead a total ban on internet access, plaintiffs argue that the "alternative must be more than merely theoretically available. It must be realistic as well . . . Furthermore, an adequate alternative cannot totally foreclose a speaker's ability to reach one audience even if it allows the speaker to reach other groups," quoting from *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000). But the fact is that every audience may be reached by the plaintiffs, just not in the way that plaintiffs feel is more efficient or more fun or "better." Plaintiffs can still write letters to the editor, communicate by mail or email, communicate by internet message board and communicate with adults on social networking sites that do not allow minors. They can talk on the phone and write letters all they want. Under this Act, they can even go to parks. They can go to civic meetings or meetings of the local drainage board. Plaintiffs can access the Indiana Supreme Court on the internet and can go watch the Indiana General Assembly in action. Plaintiffs can ask their legislator to repeal the Act. The Act is in no way a complete or total ban that precludes the plaintiffs from communicating with any audience that wants to communicate with them or receive communication from them. Thus, the claim that "The challenged statute totally forecloses various methods of communication. If Mr. Doe or class members wish to engage in a discussion with others commenting on an *Indianapolis Star* article, they cannot do so," Memo., p. 21, is simply not true. They just have to go about it the old-fashioned way. The limited class of registered sex offenders cannot engage in online discussions that take place on social media websites or sites that can only be

12

accessed through social media sites that also allow access to children, but letters to the editor and in-person discussions as well as discussions on social web sites without child access are still available, with no attempt to restrict or prohibit those communications. Lest it be overlooked, one needs to remember that telephones are still a viable method of communicating. And despite the fact that members of some generations want to text everything, people may still talk to each other in person. Most people can still probably speak faster than they can type, thus facilitating more communication by phone or otherwise orally, with more information being exchanged in a shorter time, and likely more clearly and completely. In some regards, an internet ban might be an improvement.

Plaintiffs complain that "They can write a letter to the *Indianapolis Star* or follow their candidate in the news, but they will not be able to engage in the give-and-take dialogue that comments via Facebook or other sites engender and allow. " Memo., p. 22. But restricting this "give and take" is not the same as "totally foreclosing" the ability to reach an audience. They can't falsely yell "fire" at a political opponent's crowded campaign appearance, either, but that hardly qualifies as a deprivation of free speech. They can't engage in one form of communication— the "give and take dialogue" via Facebook—but they can still communicate about the same things with the same people, albeit not instantly from a distance—unless, of course, they pick up a phone.

Plaintiffs assert that "If a person today wants to participate in discussions and networking with a large number of persons on an informal and easy basis, their

13

***only*** means of doing so is through social networking sites." Memo., p. 22 (emphasis added). Plaintiffs conflate *ease* of speech with *access* to speech. Social networking participation is not the "only" means of participating in discussions and networking; it is merely the best available now, the one plaintiffs most prefer. But the indisputable fact is that internet access is not necessary in order to communicate. At the time the First Amendment was added to the Constitution, there was no internet. Within recent memory, no one relied on the internet to communicate because it had not yet been invented. Today, some people still don't communicate through the internet or social networking sites or chat rooms or instant messaging programs, but they communicate. There is no right to the best or the most preferred method of communicating, merely that communication not be banned altogether or that access to an entire segment of the population not be prohibited. There is no such total ban here, and the Act is constitutional.

The plaintiffs try to compare this case to the situation in *United States v. Stevens*, – U.S. – , 130 S.Ct. 1577 (2010), saying that "As is indicated above, the challenged statute 'create[s] a criminal prohibition of alarming breadth.' [*United States v.*] *Stevens*, 130 S.Ct. [1577,] 1588 [(2010)]." Memo., p. 23. The statute at issue in *Stevens* relied upon prosecutorial discretion for what restraint there was, unlike the Indiana statute, which is limited on its face to only certain sex offenders who committed crimes involving children and to only certain uses of the internet. The two statutes cannot be compared. Indiana's statute is narrowly tailored to keep convicted, registered sex offenders who committed a crime that involved children

from accessing more children via the internet. That is a narrow, "plainly legitimate sweep" designed to protect children from the harm these predators are likely to bring. There is nothing overly broad about the statute such that a finding of facial invalidity is warranted. The Act does not apply to general news or informational websites merely because such sites allow readers to comment on, link to, or forward news articles or similar content. The definitions of chat room, instant messaging software and social networking site are not that broad. They include only programs that "allow[] two (2) or more members or authorized users to communicate over the Internet in real time using typed text" or a web site that:

> (1) facilitates the social introduction between two (2) or more persons;
> (2) requires a person to register or create an account, a username, or a password to become a member of the web site and to communicate with other members;
> (3) allows a member to create a web page or a personal profile; and
> (4) provides a member with the opportunity to communicate with another person.

Internet access remains available to all persons, including convicted, registered sex offenders. The Act is not, therefore, violative of the First Amendment rights of the convicted registered sex offenders listed in the statute. The court should enter judgment in favor of the defendant.

## V. Conclusion

For the foregoing reasons, relief should be denied the plaintiff class and judgment should be entered for the defendant.

        Respectfully submitted,

        GREGORY F. ZOELLER
        Indiana Attorney General
        Attorney No. 1958-98

        By: *s/David A. Arthur*
        David A. Arthur
        Deputy Attorney General
        Atty. No. 2461-48
        Ind. Govt. Center South, Fifth Floor
        302 W. Washington Street
        Indianapolis, IN 46204
        Telephone: (317) 232-6286
        Fax: (317) 232-7979
        David.Arthur@atg.in.gov

### **CERTIFICATE OF SERVICE**

I hereby certify that on May 11, 2012, I electronically filed the foregoing brief with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

| | |
|---|---|
| Kenneth J. Falk | Justin Roebel |
| ACLU of Indiana | Alexander Will |
| kfalk@aclu-in.org | Office of Corporation Counsel |
| | Justin.Roebel@indy.gov |
| | Alex.Will@indy.gov |

        *s/David A. Arthur*
        David A. Arthur
        Deputy Attorney General