**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| JOHN DOE, on his own behalf and on behalf of those similarly situated<br><br>Plaintiff,<br><br>v.<br><br>PROSECUTOR, MARION COUNTY, INDIANA,<br><br>Defendant. | ) | Case No. 1:12-cv-00062-TWP-MJD |

**<u>ENTRY FOLLOWING BENCH TRIAL ON THE MERITS</u>**

In an effort to prevent the sexual exploitation of Hoosier children and protect the public at large, the State of Indiana prohibits certain registered sex offenders from using social networking sites, instant messaging programs, and chat room programs that allow access by persons under the age of 18. *See* Indiana Code § 35-42-4-12(e). The statute, enacted in 2008, makes the knowing or intentional use of these sites a Class A misdemeanor. *Id*. Plaintiff John Doe ("Mr. Doe"), on his own behalf and on behalf of those similarly situated, contends that this statute runs afoul of the targeted sex offenders' First Amendment rights. Initially, Mr. Doe filed a motion for a preliminary injunction asking the Court to temporarily enjoin enforcement of the statute by Defendant, Prosecutor of Marion County, Indiana ("State"). (Dkt. #34.) Since then, the parties have agreed that it would be appropriate for the Court to merge the preliminary injunction motion with a bench trial (Dkt. #40); *see also* Fed. R. Civ. P. 65(a)(2). Accordingly, Mr. Doe now asks the Court to issue a declaratory judgment declaring Indiana Code § 35-42-4-12 unconstitutional on its face and to permanently enjoin the State's enforcement of the statute.

The Court presided over oral arguments on May 31, 2012, and the Court thanks counsel for their excellent and thoughtful advocacy.

As discussed below, the Court finds that this content-neutral statute is narrowly tailored, leaves open ample alternative channels of communication, and is not overly broad. It follows, then, that the statute does not violate Mr. Doe's First Amendment rights. Accordingly, Mr. Doe's requests to enjoin enforcement of the statute (Dkts. #34 and #42) are **DENIED** and final judgment is entered in favor of the State.[1]

## I. BACKGROUND

As Plaintiff notes, "[t]he use of computer-based social networking web sites, instant messaging, and chat rooms has become ubiquitous in today's society." (Dkt. #35 at 1). In particular, social networking has evolved with astonishing speed. The most prominent social networking site, Facebook, was founded in 2004, just eight years ago. *Facebook Newsroom*, FACEBOOK, http://newsroom.fb.com/content/default.aspx?NewsAreaId=22 (last visited June 22, 2012) (hereinafter "Facebook Newsroom"). Originally created for college students the domain is now opened up to everyone over the age of 13. *Statement of Rights and Responsibilities*, FACEBOOK, http://www.facebook.com/legal/terms (last visited June 22, 2012).

It now has 901 million active users, including 526 million daily active users, and is available in more than 70 languages. *Id*. As Plaintiff notes, 3.1 million Hoosiers use Facebook, just shy of 50% of Indiana's population. (Dkt. #35 at 7). Importantly, Facebook recently announced that it is developing a technology that would allow children younger than 13 years old to use the social-networking site under parental supervision. Anton Troianovski & Shayndi Raice, *Facebook Explores Giving Kids Access*, WALL ST. J., June 4, 2012, at A1. That same

[1] This Entry serves as the Court's findings of fact and conclusions of law, as required by Federal Rule of Civil Procedure 52.

article noted that "many kids lie about their ages to get accounts," and as many as "7.5 million under the age of 13" use the site. *Id*. And, to make matters even more troubling, a Consumer Reports survey projects that more than 5 million Facebook users are 10 years old or younger. *That Facebook friend might be 10 years old, and other troubling news,* CONSUMER REPORTS http://www.consumerreports.org/cro/magazine-archive/2011/june/electronics-computers/state-of-the-net/facebook-concerns/index.htm (last visited June 22, 2012).

As social networking continues to grow and integrate itself into society, social networking sites become inextricably linked with other access points on the internet. For instance, in order to comment on online stories on the *Indianapolis Star's* web site, commenters must now do so through their Facebook accounts. *The Indianapolis Star,* FACEBOOK, http://www.facebook.com/indianapolis.star (last visited June 22, 2012). The same goes for certain popular political web sites like Politico. Ben Smith, *Facebook Comments*, POLITICO, http://www.politico.com /blogs/bensmith /0811/ Facebook_comments.html (last visited June 5, 2012). Moreover, the mass proliferation of social networking has greatly enhanced the interconnectedness of the world. By March 2012, more than 125 billion 'friend' connections had occurred on Facebook alone. *See* Facebook Newsroom. And, as evidenced by the "Arab Spring" uprisings in the Middle East, sites like Facebook and Twitter have helped animate numerous social movements, providing activists with a powerful launch pad to communicate with their fellow citizens. *See* William Saletan, *Springtime for Twitter:* Is the Internet Driving the Revolutions of the Arab Spring?, Slate, http://www.slate.com/articles/technology/future_tense/2011/07/springtime_for _twitter.html (last visited June 5, 2012).

But the advent of new technology always engenders new concerns. One such concern is that social networking, chat rooms, and instant messaging programs have effectively created a

"virtual playground" for sexual predators to lurk. This fear is reinforced by countless news stories, many criminal cases, and television shows like MSNBC's "To Catch a Predator" – which, as the State notes, "sadly never seems to run out of material for new episodes." (Dkt. #47 at 1); *see also United States v. Henzel*, 668 F.3d 972, 973 (7th Cir. 2012) (defendant challenged sentence that this Court issued after defendant raped 12-year-old victim after luring her across state lines using a chat room frequented by fans of online video games). And, beyond anecdotes and isolated cases, certain statistics paint a startling picture of the pervasiveness of online sexual exploitation of minors. According to one 2006 report funded through a grant issued by the United States Congress, one in seven youths has received online sexual solicitations and one in three youths has received online exposure to unwanted sexual material. Janis Wolak et al., *Online Victimization of Youth: Five Years Later*, NATIONAL CENTER FOR MISSING & EXPLOITED CHILDREN, at vii (http://www.missingkids.com/en_US/publications/NC167.pdf) (last visited June 5, 2012). Additionally, Mr. Doe himself states that his son, who is on Facebook, "has had questionable 'friend' requests'". (Dkt. 35 at 9). Simply stated, the real world and the virtual world can be dangerous places for vulnerable minors.

Given this backdrop, numerous states, including Indiana, have attempted to combat online sexual exploitation.[2] To that end, in 2008, Indiana passed a law banning certain sex or violent offenders from knowingly or intentionally using or accessing certain platforms of online communication that could be frequented by minors. Specifically, Indiana Code § 35-42-4-12, in its entirety, reads as follows:

(a) This section does not apply to a person to whom all of the following apply:

[2] Interestingly, in the past, both Facebook and MySpace have taken measures to regulate the use of their social networking sites by sex offenders. At the behest of state attorneys general, between May 1, 2008 and January 31, 2009, Facebook eliminated 5,500 sex offenders from its web site. Similarly, over a two-year period, MySpace removed 90,000 sex offenders from its site. *See* Charlotte Chang, *Internet Safety Survey: Who will Protect the Children?*, 25 BERKELEY TECH. L.J. 501, 503-06 (2010).

(1) The person is not more than:
    (A) four (4) years older than the victim if the offense was committed after June 30, 2007; or
    (B) five (5) years older than the victim if the offense was committed before July 1, 2007.
(2) The relationship between the person and the victim was a dating relationship or an ongoing personal relationship. The term "ongoing personal relationship" does not include a family relationship.
(3) The crime:
    (A) was not committed by a person who is at least twenty-one (21) years of age;
    (B) was not committed by using or threatening the use of deadly force;
    (C) was not committed while armed with a deadly weapon;
    (D) did not result in serious bodily injury;
    (E) was not facilitated by furnishing the victim, without the victim's knowledge, with a drug (as defined in IC 16-42-19-2(1)) or a controlled substance (as defined in IC 35-48-1-9) or knowing that the victim was furnished with the drug or controlled substance without the victim's knowledge; and
    (F) was not committed by a person having a position of authority or substantial influence over the victim.

(b) This section applies only to a person required to register as a sex or violent offender under IC 11-8-8 who has been:
(1) found to be a sexually violent predator under IC 35-38-1-7.5; or
(2) convicted of one (1) or more of the following offenses:
    (A) Child molesting (IC 35-42-4-3).
    (B) Child exploitation (IC 35-42-4-4(b)).
    (C) Possession of child pornography (IC 35-42-4-4(c)).
    (D) Vicarious sexual gratification (IC 35-42-4-5(a) or IC 35-42-4-5(b)).
    (E) Sexual conduct in the presence of a minor (IC 35-42-4-5(c)).
    (F) Child solicitation (IC 35-42-4-6).
    (G) Child seduction (IC 35-42-4-7).
    (H) Kidnapping (IC 35-42-3-2), if the victim is less than eighteen (18) years of age and the person is not the child's parent or guardian.
    (I) Attempt to commit or conspiracy to commit an offense listed in clauses (A) through (H).
    (J) An offense in another jurisdiction that is substantially similar to an offense described in clauses (A) through (H).

(c) As used in this section, "instant messaging or chat room program" means a software program that requires a person to register or create an account, a username, or a password to become a member or registered user of the program

> and allows two (2) or more members or authorized users to communicate over the Internet in real time using typed text. The term does not include an electronic mail program or message board program.
>
> (d) As used in this section, "social networking web site" means an Internet web site that:
>
> (1) facilitates the social introduction between two (2) or more persons;
> (2) requires a person to register or create an account, a username, or a password to become a member of the web site and to communicate with other members;
> (3) allows a member to create a web page or a personal profile; and
> (4) provides a member with the opportunity to communicate with another person.
>
> The term does not include an electronic mail program or message board program.
>
> (e) A person described in subsection (b) who knowingly or intentionally uses:
>
> (1) a social networking web site; or
> (2) an instant messaging or chat room program;
>
> that the offender knows allows a person who is less than eighteen (18) years of age to access or use the web site or program commits a sex offender Internet offense, a Class A misdemeanor. However, the offense is a Class D felony if the person has a prior unrelated conviction under this section.
>
> (f) It is a defense to a prosecution under this section that the person:
>
> (1) did not know that the web site or program allowed a person who is less than eighteen (18) years of age to access or use the web site or program; and
> (2) upon discovering that the web site or program allows a person who is less than eighteen (18) years of age to access or use the web site or program, immediately ceased further use or access of the web site or program.

Indiana Code § 35-42-4-12 (emphasis added). Laws like Indiana's are part of a growing trend in many states and cities throughout the country. As a recent article in the *New York Times* noted, "communities around the country have gone beyond regulating where sex offenders can live and begun banning them outright from a growing list of public places." Ana Facio-Krajcer, *Public-Place Laws Tighten Rein on Sex Offenders*, N.Y. TIMES, May 29, 2012, at A15. Some commentators have argued that these laws lack efficacy and are merely low-hanging fruit for legislatures – "laws that can be passed to make people feel good[.]" *Id*. Others, however, have

emphasized the deterrent effect of such laws and have argued that they are common sense measures to protect children. *Id*.[3]

Here, the focal point of Mr. Doe's challenge to the statute is subsection (e), which makes it a Class A misdemeanor for certain sex offenders (those described in subsection (b)) to knowingly or intentionally use "a social networking web site" or "an instant messaging or chat room program" if the offender knows that minors are allowed "access or use" of that site. Under the statute, subsection (a) exempts certain offenders from the statute, primarily those who were involved in what the State has dubbed "Romeo and Juliet" type relationships (where the victim has reached a certain age but is below the age of consent, and enters into a "consensual" sexual relationship with an adult who is under the age of 21). Subsection (c) defines "instant messaging or chat room program" while subsection (d) defines "social networking web site." Subsections (c) and (d) clarify that the phrases "instant messaging or chat room program" and "social networking web site" do not include message boards or email.

For good reasons, the Court has allowed Mr. Doe, an adult resident of Indianapolis, Indiana, to proceed anonymously in this case. (Dkt. #26.) But, through the briefing, Mr. Doe has revealed certain information about himself which sheds light on why he is challenging the statute. Mr. Doe was arrested in Marion County in 2000 and convicted of two counts of child exploitation. He was released from prison in 2003 and from probation in 2004, and is not currently on any form of parole, supervised release or similar restrictions. Mr. Doe has physical custody of his teenage son. Under Indiana law, Mr. Doe is required to register on Indiana's sex and violent offender registry for the remainder of his life. Because Indiana Code § 35-42-4-12(e)

---

[3] No statistics concerning the efficacy of Indiana's statute (or other similar measures) are in the record, probably because reliable statistics are difficult to ascertain. After all, it is exceedingly difficult to prove a negative as it would likely be impossible to accurately determine exactly how many incidents of sexual exploitation of minors have been *prevented* as a result of this legislation.

applies to him, Mr. Doe is barred from knowingly or intentionally accessing a social networking site, instant messaging program, or a chat room, if he knows that site allows someone under the age of 18 to use or access the site. Mr. Doe would like to access such sites and programs for legitimate and lawful reasons. For example, Mr. Doe would like to: (1) use Facebook to monitor his teenage son's social networking activity; (2) participate in certain political speech online that requires social networking accounts; (3) advertise for his small business using social networking; (4) view photographs and videos of family members who are scattered throughout the United States; and (5) participate in certain communications and petitions relevant to pilots (Mr. Doe is also a pilot).

Mr. Doe challenges Indiana's statute on First Amendment grounds, writing that "[t]o the extent that this ban is applied to former offenders who are not on parole, probation, or other forms of supervised release, it denies them the ability to communicate and associate in violation of the First Amendment of the United States Constitution." (Dkt. #35 at 1). The State counters that the statute does not violate Mr. Doe's (or similarly situated persons') First Amendment rights, highlighting that "the statute is narrowly directed at those found most likely to commit repeat offenses and who have victimized children." (Dkt. #47 at 3). Additional facts are added below as needed.

## II. DISCUSSION

### A. First Amendment Rights Affected

Mr. Doe makes a facial challenge to the statute at issue on First Amendment grounds. The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend. I. According to Mr. Doe, the

statute affects three rights secured by the First Amendment: (1) the right to communicate; (2) the right to receive information; and (3) the right to associate.

It appears well-settled that all three of these rights are secured by the First Amendment. *See, e.g., Hill v. Colorado*, 530 U.S. 703, 728 (2000) (the First Amendment protects "the right of every citizen to reach the minds of willing listeners") (citations and internal quotations omitted); *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008) ("[T]he First Amendment protects modern forms of communications."); *Board of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (plurality) ("the right to receive ideas follows ineluctably from the *sender's* First Amendment right to send them") (emphasis in original); *Christian Legal Society v. Walker*, 453 F.3d 853, 861 (7th Cir. 2006) (noting that the First Amendment protects "the freedom to gather together to express ideas – the freedom to associate") (citations omitted). Moreover, it is also settled that the First Amendment's protections "extend fully to communications made through the medium of the internet." *Doe v. Shurtleff*, 628 F.3d 1217, 1222 (10th Cir. 2010), *cert. denied*, __ U.S. __, 131 S.Ct. 1617 (2011) (citing *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870 (1997) (explaining that the internet allows "any person with a phone line [to] become a town crier with a voice that resonates farther than it could from any soapbox" and that "our cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium")).

**B. What standard applies to the constitutional analysis of this statute?**

Having established that his First Amendment rights are affected by the statute, Mr. Doe argues that the statute fails the requisite scrutiny. Significantly, Mr. Doe concedes that the statute is "content neutral," which means that it is a speech regulation that is "justified without reference to the content of the regulated speech." *Ward v. Rock Against Racism*, 491 U.S. 781,

791 (1989) (citation and internal quotations omitted). In other words, the law is not related to the subject matter or topic of speech. "For First Amendment purposes, content-neutral regulations do not pose the same inherent dangers to free expression that content-based regulations do; thus, they are subject to a less rigorous analysis, which affords the government latitude in designing regulatory solutions." 16A AM. JUR. 2D *Constitutional Law* § 478 (citation omitted).

Specifically, a content neutral regulation is upheld if it: (1) is "narrowly tailored to serve a significant governmental interest"; and (2) "leave[s] open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791 (emphasis added). If the statute satisfies these criteria, then it is deemed to be a "reasonable time, place and manner regulation[.]" *United States v. Grace*, 461 U.S. 171, 177 (1983). Mr. Doe argues that the Indiana statute at issue is not narrowly tailored and fails to leave open alternative channels of communication; therefore, it fails on both fronts. Obviously, the State disagrees. The Court considers these requirements in turn.

**1. Narrow Tailoring**

As an initial matter, throughout the briefing, Mr. Doe emphasizes both the overly broad nature of the statute and its lack of narrow tailoring. As Mr. Doe's counsel conceded at oral arguments, however, these are two sides of the same coin – not two separate and distinguishable arguments. (This makes sense, as a statute presumably cannot be both "overly broad" and "narrowly tailored.") Moreover, it is worth noting that the overbreadth doctrine is not needed where, as here, "[t]he plaintiffs in this case assert their legitimate intention to engage in the protected expression themselves" and "a plaintiff class has been certified which includes everyone who might be affected by the statute." *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1056 (7th Cir. 2004) (citations omitted). Thus, Mr. Doe "need not really rely on the

overbreadth doctrine to assert [his] facial challenge." *Id*. Accordingly, the Court will confine its analysis to whether or not the statute is "narrowly tailored." But, in doing so, the Court will of course consider whether the statute is "overly broad."

"[T]he requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation…. So long as the means chosen are not substantially broader than necessary to achieve the government's interest . . . the regulation will not be invalid simply because a court concludes that the government interest could be adequately served by some less-speech-restrictive alternative." *Ward*, 491 U.S. 799-800 (emphasis added; citations and internal quotations omitted). To defend the regulation on speech, the government must "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994).

Mr. Doe does not dispute that the statute promotes "a substantial government interest"; nor does he dispute that the harms posed by online sexual predators are "real." *See, e.g., Sable Communications of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989) (the government has "a compelling interest in protecting the physical and psychological well-being of minors"). Instead, Mr. Doe argues that the "means chosen are substantially broader than necessary." According to Mr. Doe, the statute's "vast breadth" is illustrated by the fact that it precludes certain sex offenders from: making comments about current events on the *Indianapolis Star* web site; participating in political discussions in certain chat rooms; advertising for businesses using certain social networking sites; or sharing photos and having group discussions with family members through Facebook. On this point, the Court readily acknowledges that the statute captures considerable conduct that has nothing to do with interacting with minors.

That said, Mr. Doe's argument is important for what it does *not* say. Tellingly, Mr. Doe never furnishes the Court with workable measures that achieve the same goal (deterrence and prevention of online sexual exploitation of minors) while not violating his First Amendment rights. Here, the statute bars a subset of registered sex offenders from visiting a subset of web sites that minors (and the public at large) use with regularity, which include Facebook, Twitter, Google Plus, various chat rooms, and various instant messaging programs. In other words, Mr. Doe is only precluded from using web sites where online predators have easy access to a nearly limitless pool of potential victims.

Notably, the vast majority of the internet is still at Mr. Doe's fingertips. *Cf. United States v. Miller*, 594 F.3d 172, 188 (3d Cir. 2010) (vacating special condition of supervised release forever banning person convicted of receiving child porn from ever accessing the internet); *United States v. Holm*, 326 F.3d 872, 877-79 (7th Cir. 2003) ("We find that to the extent that the condition is intended to be a total ban on Internet use, it sweeps more broadly and imposes a greater deprivation on Holm's liberty than is necessary, and thus fails to satisfy the narrow tailoring requirement of § 3583(d)(2)."). For example, Mr. Doe could create or participate in a LISTSERV (a computer program that allows people to create, manage and control electronic mailing lists) in order to communicate with fellow pilots or persons who have other similar interests. And, importantly, Mr. Doe (and those similarly situated) can still communicate through email, message boards, and social networking sites that require the user to be 18 years old.

Although there was some confusion on this point during the briefing, it is seemingly clear that Mr. Doe can use the professional networking web site LinkedIn. *See* LinkedIn Privacy Policy, Section 5A, *Important Information*, http://www.linkedin.com/ static?key= privacy_policy

(last visited June 5, 2012) ("Children under the age of 18 are not eligible to use our service.").[4] Therefore, Mr. Doe is incorrect when he writes that he "cannot communicate with peers and potential clients and employers on . . . LinkedIn[.]" (Dkt. 35 at 18).

As the State argued, because the statute prohibits only certain sites that allow minors, if a minor untruthfully accesses that site, that is not the same thing as being *allowed* by the site to have access. Further, the statute at issue provides a defense to prosecution if the person (1) did not know that the web site or program *allowed* a person who is less than eighteen (18) years of age to access or use the web site or program; and (2) upon discovering that the web site allows a person who is less than eighteen years of age to access or use the program, immediately ceased further use or access of the web site or program**.**

In short, the Court finds that Indiana's statute is not "substantially broader than necessary" to achieve its goals of prevention and deterrence. Under these circumstances, courts are deeply reluctant to invalidate a statute and prohibit a State from enforcing conduct that is within its power to proscribe. See *Broadrick v. Oklahoma*, 413 U.S. 601 at 614 (1973). Perhaps this Court could devise a "less-speech-restrictive alternative" that still achieved the same basic goals. However, the Court's role is not to draft a perfect law. Instead, the Court is only tasked with ensuring that means chosen are not "substantially broader than necessary." As described above, this law fulfills this criterion.

Mr. Doe makes a separate, but related, argument under the heading of narrow tailoring: namely, this law is unnecessary because Indiana already prohibits the solicitation of children "by using a computer network." *See* Indiana Code § 35-42-4-6(a)(4); *see also* Indiana Code § 35-42-4-13(c) (barring person who is at least 21 from knowingly or intentionally communicating with

[4] At oral arguments, the State conceded that if, in fact, this was LinkedIn's policy, Doe would be able to use it.

an individual whom the person believes to be less than 14 concerning "sexual activity with intent to gratify . . . sexual desires"). According to Mr. Doe, there is no point in criminalizing the mere use of a web site when the real wrongs – online solicitation and age-inappropriate sexual communication – are already criminalized. This argument has some appeal, but the Court is not persuaded. Significantly, the statutes serve different purposes. One set of statutes aims to *punish* those who have *already committed* the crime of solicitation. The challenged statute, by contrast, aims to *prevent and deter* the sexual exploitation of minors by barring certain sexual offenders from entering a virtual world where they have access to minors.

In making this distinction, it is worth emphasizing that the risk of recidivism by sex offenders has been described by the United States Supreme Court as "frightening and high." *Smith v. Doe* 538 U.S. 84, 103 (2003) (citation and internal quotations omitted); *see also Conn. Dept. of Public Safety v. Doe*, 538 U.S. 1, 4 (2003) ("[W]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be re-arrested for a new rape or sexual assault.") (citation and internal quotations omitted).[5] Given the high recidivism rates, it is obvious that many sex offenders have difficulty controlling their internal compulsions to commit these crimes. It stands to reason that many sex offenders might sign up for social networking with pure intentions, only to succumb to their inner demons when given the opportunity to interact with potential victims.

Logically following, society has a strong interest in ensuring that sex offenders do not place themselves in these potentially dangerous situations. That is what this law attempts to do,

[5] That being said, the Court has also located articles calling the accuracy of these statements into question. *See* Carl Bialik, *Underreporting Clouds Attempt to Count Repeat Sex Offender*, WALL ST. J., January 25, 2008, http://online.wsj.com/article/SB120122376053515485.html (last visited May 31, 2012) ("Conventional wisdom says people released after serving time for sex crimes are likely to strike again. The numbers aren't as certain. Among convicted criminals released from prison, sex offenders released from prison are less likely to be arrested for any new crime than most other offenders, with the notable exception of murderers, researchers say.").

and laws with similar purposes have been upheld. *See, e.g., United States v. Comstock,* __ U.S. __, 130 S.Ct. 1949, 1954 (2010) (Congress has the authority under the Constitution to allow the continued civil commitment of sex offenders after they have completed their criminal sentences); *Smith*, 538 U.S. at 93 ("[A]n imposition of restrictive measures on sex offenders adjudged to be dangerous is a legitimate nonpunitive governmental objective and has been historically so regarded.") (citation and internal quotations omitted); *see also* Indiana Code § 35-42-4-11(c) (prohibiting certain registered sex offenders from residing within 1,000 feet of a school, park or youth activity center).

As the Seventh Circuit noted in *Doe v. City of Lafayette*, 377 F.3d 757 (7th Cir. 2004), "[t]he City was not bound to wait until Mr. Doe again committed [a crime against children] in order to act." *Id*. at 767, n.8. That principle applies with considerable force here, notwithstanding the distinguishing features between that case and the present one. Or, as the State writes, it "need not wait until a child is solicited by a sex offender on Facebook; rather, it can bar predators from haunting social networking websites in the first place." (Dkt. 47 at 8). In sum, the need to deter sexual predators reinforces that the statute at issue is not rendered unnecessary by a separate Indiana statute criminalizing online child solicitation. The statute at issue bars a subset of sex offenders from using a subset of web sites that could easily facilitate communications between sexual predators and their prey. Accordingly, the Court finds that the statute at issue is narrowly tailored to advance a substantial government interest.[6] *See Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000) ("By limiting the ordinance's restrictions to only

[6] Although the Court did not explicitly address it for the reasons described above, this same basic reasoning would apply to Mr. Doe's arguments regarding "substantial overbreadth." Moreover, to the extent this statute applies to persons who committed sex crimes against adults (e.g. rape and criminal deviate conduct), and not children, the same basic reasoning and concerns apply. Additionally, the rapists and criminal deviates that have victimized adults are likely not similarly situated to Mr. Doe as they are not members of the class. The class encompasses the offenses noted in Indiana Code § 35-42-4-12(b)(2). (Dkt. 33 at 1). The rapist and criminal deviates required to register as sex or violent offenders are covered under Indiana Code § 35-42-4-12(b)(1).

those certain times and places where citizens naturally would feel most insecure in their surroundings, the city has effectively narrowed the application of the law to what is necessary to promote its legitimate interest.”).

**2. <u>Alternative channels of communication</u>**

But that does not end the inquiry, as the statute must also leave open ample alternative channels for communication. It is well-established that “[a]n adequate alternative does not have to be the speaker’s first or best choice . . . or one that provides the same audience or impact for the speech.” *Id*. (citations omitted). However, the choice must be more than “theoretically available”; it must be “realistic as well.” *Id*. Mr. Doe argues that his access to alternative channels of communications has been severely and unnecessarily curtailed. On this point, Mr. Doe contends that the challenged statute “totally forecloses various methods of communication.” (Dkt. #35 at 21).

The Court respectfully disagrees. Facebook, Twitter, Google Plus, and the like are important communicative tools, but Mr. Doe still has myriad feasible alternative forms of communications at his disposal, including the ability to congregate with others, attend civic meetings, call in to radio shows, write letters to newspapers and magazines, post on message boards, comment on online stories that do not require a Facebook (or some other prohibited account), email friends, family, associates, politicians and other adults, publish a blog, and use social networking sites that do not allow minors (e.g. LinkedIn and a number of other sites which allow only adults). The Court readily concedes that social networking is a prominent feature of modern-day society; however, communication does not begin with a “Facebook wall post” and end with a “140-character Tweet.” As previously indicated, Mr. Doe points out that “In Indiana there are 3.1 million persons, slightly less that 50% of the population, who use Facebook” (Dkt.

#35 at 7), which would mean that slightly more than 50% of Hoosiers do not use Facebook. It is evident that robust supplies of alternative forms of communication are easy to use, realistic, and effective. It is true, as Mr. Doe emphasizes, that some of the banned forms of communication may be superior in numerous respects to their "old-fashioned" counterparts. But, again, to be "adequate," the channel of communication does not have to be "the speaker's first or best choice." *Gresham*, 225 F.3d at 906.; *see also Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 809 (1985) (an ample alternative does not need to be the most efficient one for speaker's purposes). Accordingly, the Court finds that, notwithstanding Indiana Code § 35-42-4-12, Mr. Doe still has an adequate number of substitute forms of communication at his disposal.

**C.    Is *Doe v. Jindal* on-point?**

Before concluding, the Court pauses to acknowledge the District Court of the Middle District of Louisiana's non-binding decision in *Doe v. Jindal*, 2012 WL 540100 (M.D. La. Feb. 16, 2012). In *Jindal*, the district court ruled that a Louisiana statute barring certain sex offenders who had committed crimes against children from accessing social networking sites, chat rooms, and peer-to-peer networks was unconstitutionally overbroad. The court concluded that:

> [t]here can be no doubt that the state has a wholly legitimate interest in protecting children from sex offenders online. However, the state's interests can [only] be served by a narrowly drawn statute tailored precisely toward the conduct the [state] wishes to proscribe . . . . In its current form, the Act is not crafted precisely or narrowly enough – as is required by constitutional standard – to limit the conduct it seeks to proscribe. Accordingly, on its face . . . the Act is substantially overbroad and, therefore, invalid under the First Amendment.

*Id*. at *6. For obvious reasons, Mr. Doe highlights the strong resemblance between this case and *Jindal*.

However, for numerous reasons, *Jindal* is distinguishable. First, the *Jindal* court observed that Louisiana's statute appeared to ban an extreme array of web sites–including the web site for the court and potentially imposed "a sweeping ban on many commonly read news and information websites, in addition to social networking websites such as MySpace and Facebook." *Id*. at *5. Importantly, Indiana's statute does not pose similar concerns; the State readily concedes that Mr. Doe is free to surf all manner of basic news and information sites. Second, here, the parties agree that the statute is content-neutral, and therefore should be analyzed using the "narrow tailoring/alternative channels" framework. The *Jindal* court did not mention, let alone employ, this framework. Third, the *Jindal* court relied heavily on the Supreme Court's decision in *United States v. Stevens*, __ U.S. __, 130 S.Ct. 1577 (2010). However, *Stevens* did not deal with a content-neutral statute, like the Indiana statute. Instead, *Stevens* involved a federal statute criminalizing the commercial creation, sale, or possession of depictions of animal cruelty. Accordingly, the federal statute "explicitly regulate[d] expression based on content[.]" *Id*. at 1584 (emphasis added). Thus, *Stevens* is not particularly applicable to the present case. For these three reasons, the Court finds that *Jindal* is distinguishable.

## III. CONCLUSION

For the above reasons, the Court **DENIES** Mr. Doe's Motion for Preliminary Injunction and his request for permanent relief in the form of a declaratory judgment and a permanent injunction. (Dkts. #34 and #42.) Final judgment in favor of the State will accompany this entry.

SO ORDERED.

Date: 06/22/2012

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

David A. Arthur
OFFICE OF THE ATTORNEY GENERAL
David.Arthur@atg.in.gov

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Justin F. Roebel
CITY OF INDIANAPOLIS, OFFICE OF CORPORATION COUNSEL
jroebel@indygov.org

Kate E. Shelby
INDIANA ATTORNEY GENERAL
kate.shelby@atg.in.gov

Alexander Phillip Will
OFFICE OF CORPORATION COUNSEL
awill@indygov.org